IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROSALIE ROJAS FIGUEROA, | ) | Case No. 1:24-cv-00282 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.     Introduction

Plaintiff, Rosalie Rojas Figueroa ("Rojas Figueroa"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Rojas Figueroa's applicaitons for DIB and SSI be affirmed.

## II.    Procedural History

Rojas Figueroa filed for SSI on September 7, 2021, and DIB on September 10, 2021, alleging a disability onset date of January 1, 2020. (Tr. 22). The claims were denied initially and on reconsideration. (Tr. 142, 147, 159, 162). She then requested a hearing before an Administrative Law Judge. (Tr. 168). Rojas Figueroa, represented by counsel, and a vocational

expert ("VE") testified before the ALJ on April 10, 2023. (Tr. 50-79). On April 26, 2023, the

ALJ issued a written decision finding Rojas Figueroa not disabled. (Tr. 19-43). The Appeals

Council denied her request for review on December 20, 2023, making the hearing decision the

final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Rojas

Figueroa timely filed this action on February 14, 2024. (ECF Doc. 1).

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Rojas Figueroa  was 40 years old on the alleged onset date, making her a younger

individual according to Agency regulations. (*See* Tr. 41). She has limited education. (*See id.*). In

the past, she worked as a fast-food manager, home health aide, and shipping and receiving clerk.

(Tr. 72-73).

#### B.    Relevant Medical Evidence[1]

##### 1.    Physical Health

Throughout the course of Rojas Figueroa's medical appointments, encounter notes

indicate Rojas Figueroa was alert and oriented with normal mood, affect, and behavior. (Tr. 405,

407-08, 414, 417, 553, 561, 566, 569, 778, 784, 952, 970, 1031, 1054, 1185). It was also

consistently noted that Rojas Figueroa's musculoskeletal system had a normal range of motion.

(Tr. 405, 407, 414, 417, 550, 561, 666, 774, 784, 951, 1030, 1053-54, 1180). Any record

indicating different findings will be detailed below.

---

[1] Rojas Figueroa only raises error with respect to the ALJ's evaluation of her migraines, pain, obesity, and cane usage. (See ECF Doc. 8). I therefore limit the review of the medical record only to the evidence relevant to those claims. Any arguments concerning her other physical or mental impairments are deemed waived. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013).

On April 29, 2020, Rojas Figueroa presented to an appointment with Amy Ebbitt, APRN, CNP. (Tr. 415). One of Rojas Figueroa's chief complaints was headaches with sensitivity to light; the pain was worse when looking left or right. (*Id.*). Her headache frequency had slightly elevated from the previous month, but Rojas Figueroa reported that the headaches resolve with Imitrex and she only occasionally needed to take Excedrin. (Tr. 415-16). She was prescribed Sumatriptan 100 mg as needed for migraines. (Tr. 417). Rojas Figueroa's body mass index ("BMI") was noted at 47.63, but she reported that she had lost some weight recently. (Tr. 416). She was listed as obese with no signs of distress and her musculoskeletal system had a normal range of motion. (Tr. 417). She was alert and oriented with normal mood, affect, and behavior. (*Id.*). CNP Ebbitt counseled Rojas Figueroa on her BMI, planned a follow up, and referred her to Dietetics Service. (*Id.*).

During a May 29, 2020 follow up with CNP Ebbitt, Rojas Figueroa reported that she had not met with the dietician or followed a calorie restrictive diet, but had been losing weight owing to her increased activity. (Tr. 412-13). Rojas Figueroa also reported increased neck pain that radiated to her right shoulder, worse at bedtime. (Tr. 413). Upon examination, Rojas Figueroa's neck had a normal range of motion. (Tr. 414).

On February 7, 2021, Rojas Figueroa presented to the emergency room after falling down three stairs. (Tr. 551). Encounter notes indicate that after the fall she was able to ambulate and bear weight. (*Id.*). She had normal gait and ambulated with a steady gait out of the emergency department. (Tr. 553; 558).

At a March 9, 2021 hypertension follow up appointment with Katy Foutz, RN, Rojas Figueroa reported that her "head wants to explode-temple areas/frontal[.]" (Tr. 409). She reported relief after applying Vicks and drinking a lot of water. (*Id.*). RN Foutz provided

hypertension education and encouraged effort toward healthy eating and increased activity. (Tr. 410).

Rojas Figueroa presented to CNP Ebbitt on April 14, 2021 with concerns of ongoing shoulder pain and progressive lower back pain. (Tr. 405). She reported trouble sleeping as a result because the pain increased with periods of inactivity or sitting. (*Id.*). Flexeril and Tramadol were either ineffective or minimally effective to treat pain. (Tr. 406). Upon examination, CNP Ebbitt noted that Rojas Figueroa looked uncomfortable but not in distress. (Tr. 407). While examinations indicated a normal range of motion and gait, Rojas Figueroa reported arthralgias, back pain, gait problems, and myalgias. (*Id.*).

On June 3, 2021 Rojas Figueroa reported to CNP Ebbitt numbness in her legs and an inability to walk or sit for long periods. (Tr. 404). The numbness resulted in her falling twice. (*Id.*). She also complained of worsening lower back pain that radiated through her hip to her knee and sometimes beyond. (*Id.*). She reported the pain as a 5/5. (*Id.*). She further reported that her neck pain was improving with physical therapy and injections. (*Id.*). Rojas Figueroa was referred to physical therapy and prescribed Gabapentin 100 mg for pain. (Tr. 405).

On July 1, 2021, Rojas Figueroa presented to the emergency room with complaints of right knee pain without injury. (Tr. 504). The pain was worse with weight bearing and extension. (Tr. 505). She expressed some internal knee instability when walking. (Tr. 504). Upon examination, her knee had no swelling, deformity, erythema, or ecchymosis. (Tr. 506). She had normal range of motion but some tenderness. (*Id.*). She was able to rise from the seated position and ambulate but was mildly antalgic. (*Id.*). She was alert and oriented with cooperative behavior. (*Id.*).

At a July 7, 2021 appointment with Kim Stearns, M.D., Rojas Figueroa complained of right knee pain. (Tr. 504). She experienced pain going up and down stairs and getting up from a seated position. (*Id.*).  Dr. Stearns noted that x-rays showed a very large intra-articular loose body just posterior to the notch. (Tr. 504). The knee pain was treated a week later with Marcaine 1cc and Depo-Medrol injections. (Tr. 500).

Rojas Figueroa presented for an appointment with CNP Ebbitt on September 24, 2021, with a complaint of continuous overall body aches that caused her to leave her job, as well as right arm tingling. (Tr. 782). CNP Ebbitt prescribed Gabapentin 300 mg for pain. (Tr. 784). Encounter notes also indicate that Rojas Figueroa has a history of major depression with suicidal ideation that began when she was a teenager with the most recent episode being in 2004. (Tr. 783). Rojas Figueroa had been taking Zoloft but discontinued taking it due to improvement and nausea. (*Id.*). CNP Ebbitt referred her to behavioral health counseling and prescribed Duloxetine 20 mg. (Tr. 784).

On December 3, 2021, Rojas Figueroa underwent an arthroscopy on the right knee and synovial debridement performed by Dr. Stearns. (Tr. 689).

Rojas Figueroa presented to the emergency room on December 5, 2021, complaining of left side facial pain, headache, and hypertension. (Tr. 673). Rojas Figueroa presented using a walker due to her recent knee surgery and right leg weakness associated with the surgery. (*Id.*). Rojas Figueroa's headache began on December 3, 2021, and was on the left side of her forehead and temple with sharp pain. (Tr. 673, 679). This headache was different than her typical migraines as those tended to affect the front of her head with throbbing pain. (Tr. 673). She was also experiencing left arm numbness and hand weakness. (Tr. 679). The oxycodone she was taking for her knee provided no relief to her headache. (Tr. 673). She did not take her Imitrex out

of fear that it would interfere with the oxycodone. (Tr. 674). The treating physician noted that this was a complex migraine exacerbated by Rojas Figueroa's underlying anxiety. (Tr. 679). There were no objective signs of weakness in her upper extremities; upon examination she had equal grip strength bilaterally, equal push pull bilaterally, was able to hold both arms up for 10 seconds without any noted trauma, and strength with dorsal and plantar flexion bilaterally was listed as 5/5. (Tr. 676). A CT scan showed no acute abnormality, but Rojas Figueroa was going to be admitted to undergo an MRI. (Tr. 679). Rojas Figueroa left the emergency room, against medical advice, stating she had been waiting too long for a floor bed. (Tr. 684).

Rojas Figueroa came back to the emergency room on the advice of her primary care physician on December 6, 2021. (Tr. 664). She presented with continued intermittent headache and left side weakness. (*Id.*). A CTA of her head and neck revealed patent intracranial arterial vasculature, without proximal occlusion or focal stenosis and stenosis; tiny 1.5mm inferolaterally directed prominence from the right M1 segment favored to reflect small infundibulum. (Tr. 668). There was no evidence of aneurysm otherwise. (*Id.*). Given this CTA impression, Rojas Figueroa was discharged and instructed to follow up with neurology. (Tr. 670).

At a December 8, 2021 appointment with Brian Bouchard M.D., Dr. Bouchard reviewed the CTA from Rojas Figueroa's emergency room visit. (Tr. 775). Dr. Bouchard noted that the only abnormality was a slightly elevated white blood count which was possibly a viral syndrome and noted no red flag symptoms. (*Id.*). He emphasized hydration, rest, and a low stimulation environment for a few days. (*Id.*).

On March 21, 2022, Rojas Figueroa saw Anne Wise, M.D. for ongoing lower back pain that radiated down her right leg. (Tr. 970). Rojas Figueroa reported pain in her left leg and when

sitting and standing. (*Id.*). Rojas Figueroa requested a cane. (*Id.*). Dr. Wise prescribed a cane as needed, Prednisone 50 mg, and a 5% Lidocaine pouch. (Tr. 971).

On March 20, 2022, Rojas Figueroa presented to the emergency room for bilateral foot pain and burning. (Tr. 1051-52). After obtaining x-rays, the attending physician's impression was degenerative changes, prominent spurs of the calcaneus. (Tr. 1054).

Rojas Figueroa started attending physical therapy for her back and knee pain on March 29, 2022. (Tr. 1047). Her pain interfered with sitting, walking, standing, rising, climbing stairs, bending, heavy exertion, lifting, working, and sleeping. (*Id.*). Her therapy prognosis was good but may be limited due to the chronic nature of impairments and limited tolerance to activity. (*Id.*).  During this appointment, her gait was antalgic with decreased cadence. (Tr. 1050). Rojas Figueroa attended aquatic physical therapy twice a week for eight weeks. (Tr. 1011; 1015; 1019; 1024; 1026; 1034; 1036; 1044). During her May 2, 2022 session, Rojas Figueroa fell and was advised by her doctor to use heat and cold packs as needed on her knee and ankle. (Tr. 1034). Following the fall, Rojas Figueroa presented to her May 12, 2022 appointment with a cane. (Tr. 1027). Notes from her June 9, 2022 appointment indicate that she demonstrated no improvement in rising from a chair, standing, walking, stair negotiation, bending, lifting, physical activities, and recreational activities with a prognosis of multiple co-morbidities. (Tr. 1019). She had made minimal improvement in rising from a chair and walking by her June 29, 2022 appointment. (Tr. 1012).

On April 20, 2022, Rojas Figueroa established care with David A. Harrison, PA-C, for sacral area pain. (Tr. 1040). Her gait was noted as antalgic. (Tr. 1043). PA-C Harrison prescribed Medrol and Tizanidine. (*Id.*).

On May 11, 2022, Rojas Figueroa saw Dr. Stearns complaining of knee pain after falling. (Tr. 1032). Upon examination, Dr. Stearns noted the right knee had a trace effusion with mild crepitation and guarding in motion 0 to 110 degrees. (*Id.*). X-rays showed mild degenerative changes but no fracture. (*Id.*). Dr. Stearns gave Rojas Figueroa an injection of Marcaine and Depo-Medrol. (*Id*).

That evening, Rojas Figueroa presented to the emergency room for swelling of her left foot. (Tr. 1029). On examination, there was no obvious swelling to the left foot, ankle, or lower leg but Rojas Figueroa was complaining of pain in those areas. (Tr 1031). She was told to rest, elevate her foot, and take Tylenol. (*Id.*).

At a June 2, 2022 follow up appointment with PA-C Harrison, Rojas Figueroa reported no improvement in pain after six weeks of physical therapy. (Tr. 1022). PA-C Harrison ordered an MRI for possible injection planning. (Tr. 1024).

During a June 8, 2022 appointment with Katy Foutz, RN, Rojas Figueroa reported her pain was stable. (Tr. 947). For pain, she took Percocet, used hot and cold compresses, exercised, and attended physical therapy. (*Id.*).

Rojas Figueroa presented for an appointment with CNP Ebbitt on July 12, 2022. (Tr. 1275). She reported having a severe migraine for six days that throbbed on the right side of her head. (*Id.*). She also had nausea without vomiting and photophobia. (*Id.*). She was prescribed Trizatriptan 10 mg for her migraine and instructed to return the next day if migraine persisted. (Tr. 1276).

Rojas Figueroa saw PA-C Harrison on July 14, 2022. (Tr. 1255). PA-C Harrison noted mild bilateral hypertrophic facet arthropathy contributing to no more than mild right and no substantial left foraminal narrowing, patent spinal canal at L4-L5 and mild bilateral hypertrophic

facet arthropathy contributing to no more than mild right and no substantial left foraminal narrowing, patent spinal canal at L5-S1. (Tr. 1266).

Rojas Figueroa presented to the emergency room on July 30, 2022, complaining of knee pain. (Tr. 1177).  Her symptoms were suspected to be secondary to Baker's cyst versus chronic symptoms from large osteochondral body present in posterior joint space. (Tr. 1186-87). She was advised to rest, elevate, and use NSAIDs and ice before being discharged. (Tr. 1187).

Rojas Figueroa presented for an appointment with Dr. Stearns on August 17, 2022 regarding her knee. Upon exam, Dr. Stearns noted motion of 0 to 130 degrees, mild joint line tenderness, no significant swelling in popliteal area or instability, and negative Lanchman and McMurray tests. (Tr. 1153). Dr. Stearns prescribed Daypro 600mg and gave her an injection of Marcaine and Depro-Medrol. (*Id.*).

Rojas Figueroa saw PMHNP Smith for medication management on August 18, 2022. (Tr. 1310). She reported worsening depression and anxiety due to familial deaths, financial hardship, and chronic pain. (Tr. 1311). Rojas Figueroa was alert with appropriate insight and judgment but had depressed and anxious mood. (Tr. 1312).

On August 31, 2022, Rojas Figueroa saw Kush Goyal, M.D. for an intra-articular facet injection bilaterally at L4-L5 and L5-S1. (Tr. 1139). After the injection, Rojas Figueroa reported her pain decreased form a seven to zero. (Tr. 1140).

Rojas Figueroa saw RN Foutz for a pain review on September 12, 2022. (Tr. 1358). Rojas Figueroa reported her migraine medication, Maxalt, was not working to alleviate her migraines. (Tr. 1359). She had a migraine on September 9, 2022, and took Percocet to obtain relief. (*Id*). She reported knee and back pain daily as well as pain in her hands and migraines that

come and go. (*Id.*). RN Foutz noted that no treatments have helped Rojas Figueroa's pain outside of occasional use of Percocet. (Tr. 1364).

At a September 15, 2022 medication management appointment, Rojas Figueroa reported back and leg pain contributed to her low mood and lack of motivation. (Tr. 1384). Her general health was labeled as "generally poor," and her reported mood was depressed and anxious. (Tr. 1380-81). Rojas Figueroa also reported recent memory impairment. (Tr. 1381).

Rojas Figueroa presented to an appointment with CNP Ebbitt regarding her migraines on September 23, 2022. (Tr. 1645). She reported that her medication was not helping, and she was getting migraines "on and off." (*Id.*). CNP Ebbitt referred her to neurology and prescribed Eletriptan 40 mg. (Tr. 1646).

Rojas Figueroa began physical therapy on September 30, 2022, with an anticipated end date of November 29, 2022. (Tr. 1613). Her chief complaint was back and right knee pain. (Tr. 1613). Notes indicate that she was a fall risk, and that she fell on the stairs a few days before the appointment. (Tr. 1613-14). Her prognosis for therapy was fair due to limited tolerance to activity and the chronic nature of her impairments. (Tr. 1613). She entered therapy using a quad cane, and her gait was antalgic with decreased cadence. (Tr. 1617). Her therapy goals included improving her lumbar range of motion to within normal limits, increase lower extremity strength, reduce pain, walk stairs without falling, proper posture, and improve 10-meter walk time. (Tr. 1605-06).

On November 11, 2022, Rojas Figueroa presented to Nicole Daimer APRN-CNP for migraines. (Tr. 1541). She reported having over six migraines per month that lasted 48 to 72 hours. (Tr. 1566). Her migraines were located bilateral/frontal temporal and left occipital. (*Id.*). The left occipital location was new as was intermittent ringing in her right ear. (*Id.*). She

10

experienced photophobia, nausea, and vomiting with her migraines and her symptoms were worse with activity. (*Id.*). She was able to stand without upper body assistance. (Tr. 1570). CNP Daimer ordered an MRI and MRA which showed few scattered punctate foci of T2/FLAIR hyperintensity in the supratentorial white matter, which were nonspecific, and overall mild in extent, and predominantly in the bilateral frontal subcortical white matter. (Tr. 1489). No acute intracranial abnormality was found. (Tr. 1491). There was mild cervical spine degenerative changes as detailed, without high-grade canal or foraminal narrowing, and no significant cord compression or cord signal abnormality. (*Id.*).

On November 28, 2022, Rojas Figueroa presented to a medication management appointment with NP Smith. (Tr. 1766). Her depression, anxiety, and pain had worsened with stress exacerbated by financial hardships. (Tr. 1768-69). NP Smith continued her medications. (Tr. 1769).

She presented for an appointment with CNP Ebbitt on January 20, 2023. (Tr. 1833). She reported that she felt her anxiety had improved but there was still dysfunction regarding finances and physical limitations. (Tr. 1833-34). Encounter notes indicate that Rojas Figueroa had been referred to neurology for her migraines but that she had not yet scheduled an appointment. (Tr. 1834). Her gait was marked as abnormal, antalgic. (*Id.*).

Rojas Figueroa saw PA-C Harrison on January 23, 2023, for a six month follow up appointment regarding her lumbar back and right leg pain. (Tr. 1426). She reported feeling the same with unchanged symptoms. (*Id.*). PA-C Harrison noted that Rojas Figueroa's MRI showed no neuro compressive pathology, increased her Gabapentin prescription, referred her to physical therapy, and prescribed Mobic. (Tr. 1428).

### 2.    Mental Health

Rojas Figueroa initiated mental health care with Natalie Stark LISW-S on November 4, 2021, and continued through February 10, 2023. (Tr. 772, 775, 777, 1288, 1325, 1633, 1684, 1752, 1789, 1805, 1818, 1851, 1883). Throughout her sessions, Rojas Figueroa explained that she felt depressed as a result of her ongoing pain. (Tr. 777, 1325, 1338, 1755, 1792, 1821, 1886). She also expressed continued struggles with migraines and stress related to finances. (Tr. 1288, 1325, 1854). At times, she became tearful when discussing her health issues and pain. (Tr. 1687). During her December 20, 2022 session, she reported decreased energy to "fight" and felt as though she was "being pushed to snap" with her struggles with pain and depression. (Tr. 1806). Despite frequently reporting passive death wishing thoughts, she also reported that she had no plan or intent because of her mother and children. (*See e.g.* Tr. 1806). LISW Stark noted that Rojas Figueroa was alert throughout her sessions with appropriate or fair judgment and insight. (Tr. 773, 776, 780, 1325, 1338, 1633, 1686, 1754-55, 1791, 1805-06, 1821, 1854, 1886). Rojas Figueroa always reported her mood as depressed, and often also reported being anxious, angry, worried, and/or irritated. (Tr. 773, 775, 1288, 1325, 1338, 1633, 1686, 1754-55, 1791, 1805-06, 1820-21, 1854, 1886).

Rojas Figueroa saw Alenna Smith, PMHNP, on April 26, 2022 for medication management. NP Smith prescribed Buspar 10 mg for anxiety, and Trazadone 50 mg for insomnia. (Tr 965).

At a June 30, 2022 medication management appointment with NP Smith, Rojas Figueroa reported worsening depression and anxiety as a result of stress from financial hardship due to her inability to work because of her health issues. (Tr. 943). Rojas Figueroa was alert and had appropriate judgment, insight, and demeanor during this encounter. (Tr. 944).

12

Rojas Figueroa saw NP Smith for medication management on November 2, 2022. (Tr. 1699). She reported worsening depression, anxiety, and pain. (Tr. 1700). She reported depending on a cane "many days." (Tr. 1701). She also reported her new migraine medication was effective. (*Id.*). Her reported mood was depressed, nervous, anxious and worried, but she was alert with appropriate judgment and insight during the appointment. (Tr. 1702). NP Smith continued all of Rojas Figueroa's prescriptions. (Tr. 1705).

###  C.    Medical Opinion Evidence

###  1.    State Agency Reviewers

On December 22, 2021, state agency reviewer, Vicki Warren, Ph.D., reviewed Rojas Figueroa's mental health records. (Tr. 104). Dr. Warren found that Rojas Figueroa was capable of routine tasks in a setting not requiring close focus or concentration, superficial social interaction with familiar coworkers and supervisors, and routine tasks in a predictable setting where changes are infrequent and easily explained. (Tr. 105). On reconsideration, Courtney Zeune, Psy.D. agreed with these limitations. (Tr. 139).

Mehr Siddiqui, M.D., reviewed Rojas Figueroa's health records at the initial level on December 16, 2021. (Tr. 104). Dr. Siddiqui noted that Rojas Figueroa could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; stand and or walk and sit six hours in an eight-hour workday; frequently climb ramps and stairs; never claim ladders, ropes, or scaffolds, and she would have no limitation with balancing, stooping, kneeling, crouching, or crawling. (Tr. 103). Further, she was limited in her right upper extremity to occasionally reaching in front and or laterally and overhead, but unlimited with handling, fingering, and feeling. (Tr. 104).  She should further avoid concentrated pulmonary irritants and avoid all

exposure to unprotected heights. (*Id.*). On reconsideration, Indria Jasti, M.D. agreed with these findings. (Tr. 124).

### 2.     Treating Source Opinions

CNP Ebbitt filled out a Medical Source Statement on May 27, 2022. (Tr. 930-33). The statement indicates that CNP Ebbitt treated Rojas Figueroa since August 2019 and saw her every one or two months. (Tr. 930). Rojas Figueroa's diagnoses were listed as fibromyalgia, cervical spine stenosis, osteoarthritis in her right knee, hypertension, and pre-diabetes with a poor prognosis. (*Id.*). CNP Ebbitt noted that Rojas Figueroa had pain in multiple joints and the spine, fatigue, and reactive depression. (*Id.*). According to this statement, CNP Ebbitt found that Rojas Figueroa could sit for 60 minutes at a time and stand for 10 minutes at a time, she did not need to elevate her legs, she required a cane at all times due to imbalance, pain, and weakness, the cane was needed for both standing and walking. She also found that Rojas Figueroa could occasionally lift and carry less than 10 pounds, rarely lift and carry 10 pounds, and never lift and carry 20 or 50 pounds. (Tr. 932). Further, she noted significant limitation with handling or fingering, finding Rojas Figueroa could use her right and left hands 100% of the workday to grasp, turn, and twist objects, as well as use her fingers on both hands for fine manipulations. (*Id.*). However, she noted that Rojas Figueroa could only use her right and left arms to reach in front of her 10% of the workday and could not use either arm to reach overhead. (*Id.*). As to an eight-hour workday, CNP Ebbitt noted a limitation of sitting for "about 4 hours" and standing/walking for "less than 2 hours." (Tr. 931). Rojas Figueroa would be incapable of even low stress work because "major depression and anxiety make work at this time impractical." (Tr. 932-33).  According to CNP Ebbitt, Rojas Figueroa would also be off task 25% or more per day. (Tr. 932). CNP Ebbitt concluded that Rojas Figueroa's impairments as demonstrated by signs,

clinical findings, and laboratory or test results were reasonably consistent with the symptoms and functional limitations described. (Tr. 933).

LISW Stark completed a Mental Impairment Questionnaire on April 28, 2022, based on her weekly treatment of Rojas Figueroa since November 2021. (Tr. 1083-84). LISW Stark listed Rojas Figueroa's diagnoses as severe episodes of recurrent major depressive disorder without psychotic features; Generalized Anxiety Disorder; and Insomnia due to other mental disorder. (Tr. 1082). For those diagnoses, Rojas Figueroa was prescribed Cymbalta 60mg, Buspar 10mg, and Trazodone 50mg. (*Id.*). LISW Stark's clinical findings that demonstrate the severity of Rojas Figueroa's impairments and symptoms include decreased motivation, feeling uneasy and easily overwhelmed, suicidal ideations without plan, insomnia, fatigue/no energy, hopelessness. (*Id.*). Rojas Figueroa's prognosis was poor. (*Id.*). The impairments had lasted or were expected to last at least 12 months, would cause her to be absent from work five to six days per week, and would cause her to be off task 80% of the workday. (Tr. 1082-83). Of the various work related and day-to-day activities listed, LISW Stark noted that Rojas Figueroa would be unable to meet competitive standards on the following tasks: maintaining attention and concentration for extended periods, managing regular attendance and be punctual within customary tolerances, completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. (Tr. 1083).

### 3.  Consultative Examination

Rojas Figueroa was referred for a psychological evaluation with Michael Faust, Ph.D., "to assess her mental status and the existence of any psychological condition that would impair her ability to function on a daily basis and in an employment setting." (Tr. 801). The evaluation

notes that Rojas Figueroa responded to all questions with fairly detailed and articulate answers. (Tr. 804). She could not perform serial 7's but did correctly perform serial 3's. (Tr. 805). However, she would become agitated and tearful when discussing her health issues. (Tr. 804). She was withdrawn yet calm during the exam, and Dr. Faust noted that her mood appeared depressed. (*Id.*). During the exam she was oriented to person, place, and time, and she understood the purpose of the exam. (*Id.*). Rojas Figueroa expressed frustration with depending on her daughter for help cooking and cleaning. (Tr. 805). Regarding leaving the house, she stated that she does not see friends, sees her mother once a week, and goes to the grocery store with her daughter every other week. (*Id.*). Rojas Figueroa expressed being depressed due to her deteriorating health and changes in her ability to perform tasks. (*Id.*).

Dr. Faust noted that Rojas Figueroa's self-report was consistent with an adjustment disorder with mixed anxiety and depressed mood, secondary to her health issues. (*Id.*). She did not exhibit any limitations understanding simple or complex instructions. (Tr. 806). However, Dr. Faust noted that she may have difficulty remembering verbally presented instructions due to her depression based on her performance during the exam. (*Id.*). She did exhibit difficulty with attention, concentration, persistence, and pace. (*Id.*). She had difficulty with task competition and sustained attention due to presenting depressed and emotional. (*Id.*). Rojas Figueroa struggled with significant adjustment difficulties including anxiety and depression, which Dr. Faust found would impact her ability to interact with others and respond to supervision and coworkers. (*Id.*). Finally, Dr. Faust noted that Rojas Figueroa could be expected to have some difficulty responding appropriately to work pressures but had the mental ability to manage her funds should she be awarded benefits. (Tr. 807).

16

D.     **Administrative Hearing Evidence**

Rojas Figueroa lives in a two-story house with her adult son. (Tr. 57). She has a second-floor bedroom. (Tr. 57).  Rojas Figueroa is 5'4" tall and weighs 287 pounds. (Tr. 57). She completed the tenth grade in school. (Tr. 58). She has a driver's license but cannot drive for longer than 30 to 40 minutes at a time. (Tr. 57).

When asked to describe a typical day, Rojas Figueroa stated when she wakes up, she struggles to get out of bed due to pain. (Tr. 61). She only sleeps two to three hours per night leading her to have low energy and concentration. (Tr. 69). It takes her significant time to get out of bed, get into the shower, and get dressed. (Tr. 61). The bathtub in her home is "high" making it difficult to lift her knee to get into the shower when she is in pain. (Tr. 68). When her pain is exceptionally bad, she requires a chair in the shower. (*Id.*). She stated she cannot cook on the stove because her hands go numb which has led to her burning herself. (Tr. 61). She also cannot stand for a long period of time to prepare food. (Tr. 67). As a result, everything she eats is either microwavable or simple to prepare like cereal. (Tr. 61). She can do chores, but when she helps with the laundry she has to "confine" herself to the basement because she "can't keep going up and down the stairs[.]" (Tr. 62). She also helps with doing the dishes but cannot stand for too long. (*Id.*). She described 30 minutes as being too long to stand to do dishes. (Tr. 67). Sweeping and vacuuming are difficult because of pain in her legs and the chores require her to bend her back and knee. (Tr. 67-68).

Rojas Figueroa explained that she is right-handed but struggles to use her right hand due to pain, causing her to attempt tasks with her left hand. (*Id.*). As a result of needing to use her non-dominant hand she struggles with doing "anything" including combing her hair and eating. (Tr. 67).

She feels pain, mostly on her right side, all day long. (Tr. 61). Because of the pain, she does not go out or have a social life. (*Id.*). She no longer has any hobbies. (Tr. 63). She only leaves her house to go to doctor appointments. (*Id.*). However, she stated she does go shopping "sometimes" but unless the store has a motorized cart available, she cannot be in the store for a long time. (Tr. 68-69). She takes gabapentin for pain, but also takes OxyContin six or seven times a month for exceptionally bad pain. (Tr. 62).

Asked if she uses anything to help her walk, she responded that she uses a cane everyday if she needs to walk and to go up and down stairs to give herself "extra grip." (Tr. 62-63). She explained that her knee goes numb and gives out at times, causing her to fall. (Tr. 65). She uses the cane for both standing and walking, as well as to rise from a sitting position and vice-versa. (*Id.*). When using the cane, she can stand for approximately one hour, walk for 10 to 15 minutes, and sit for 15 to 20 minutes. (*Id.*). At the time of the hearing, she had been using the cane for six months. (Tr. 63). She started using it because she was falling weekly. (*Id.*). Rojas Figueroa also stated that she wears braces on her right knee and hand. (Tr. 62-63).

Asked about her back pain, Rojas Figueroa stated she experiences lower back pain that radiates down her right leg three to four times per week. (Tr. 64). On average, the pain is a nine out of ten. (*Id.*). She also experiences numbness and tingling. (*Id.*). To treat her back pain, she has "had some nerve blockage[.]" (*Id.*).  She also receives physical therapy for her back, knee, and shoulder. (*Id.*). At the time of the hearing, she had been going to physical therapy once or twice a week for approximately one year but stated that she did not feel it was helping. (Tr. 60-61).

Rojas Figueroa described her neck pain as stabbing "with a basting needle," that radiates down her back and leg. (Tr. 65-66). It also radiates down her right arm into her fingers. (Tr. 66).

18

She also experiences migraines three times per month that last two to three days. (*Id.*). When she experiences a migraine, she rubs Vicks on her forehead, stays in a dark room, and takes medication. (*Id.*).

She also struggles with mental health. (Tr. 63). She feels as though she is a burden to people and that she "shouldn't be here." (*Id.*). Her energy level is low, and she does not feel motivated "to keep going" or to keep dealing with "everything going on in [her] body." (Tr. 69). She experiences crying spells twice a day but tries to do it when she is alone. (Tr. 70). She described her mood as angry, hurt, and depressed. (*Id.*). To treat her mental health conditions, Rojas Figueroa sees a therapist and a psychiatrist; she also takes Cymbalta. (Tr. 63-64). These help "a little." (Tr. 64).

Rojas Figueroa last worked on September 5, 2021, at Burger King where she had worked for approximately two years as a general manager. (Tr. 58). In that role, Rojas Figueroa ran the floor and drive-thru, took orders, made schedules, and held crew meetings. (*Id.*). The job required her to lift 20 to 25 pounds. (Tr. 59). She left that job because she could not stand or lift as required and could not be on her feet for more than an hour before needing to stop. (*Id.*).

Rojas Figueroa also previously worked for Hearty Heart Home Health taking care of elderly individuals, helping them shower, preparing meals, and ensuring they took their medication. (*Id.*). Asked how much she had to lift in that job, Rojas Figueroa responded: "It depends on the weight of a person." (*Id.*). Additionally, Rojas Figueroa was previously employed at Buckeye Business Products for approximately seven years, working in the shipping and receiving department. (*Id.*). This job required her to lift between 30 to 50 pounds. (*Id.*).

Asked why she believes she is unable to work, Rojas Figueroa stated that she cannot stand for more than an hour before her legs go numb, she cannot lift anything with her right

19

shoulder, nor pull anything with her hands, and as a result of a recent carpal tunnel surgery her
"whole right side will go out." (Tr. 60). Her doctors intend to perform carpal tunnel surgery on
her left hand after she heals from surgery on her right. (Tr. 61).

The VE testified that Rojas Figueroa's past work included fast food manager, DOT
185.137-010, SVP 5 indicating a skilled occupation, classified as light, performed at medium;
home health aide, DOT 354.377-014, SVP 3, semiskilled, classified as medium, performed at
heavy; and shipping and receiving clerk, DOT 222.387-050, SVP 5, skilled, classified and
performed at medium. (Tr. 72-73).

According to the VE, a hypothetical individual of Rojas Figueroa's same age, education,
and work experience who could perform work at the light exertion level with never climbing
ladders, ropes, or scaffolds, occasionally climbing ramps and stairs, balancing, stooping,
kneeling, crouching, and crawling, could perform occasional overhead reaching and frequent
front or lateral reaching with the dominant right upper extremity, could perform frequent
pushing, pulling, handling, and fingering with the bilateral upper extremities, should avoid
concentrated exposure to fumes, odors, dust, gases, and poor ventilation, should avoid heights,
can understand, carry out, and remember simple instructions, routine, and repetitive tasks, cannot
perform work requiring specific production rate, assembly line work, can meet production
requirements that allow "flexible go or piece[2]," can maintain focus, persistence concentration,
pace, and attention to engage in such tasks for two-hour increments for eight-hour workdays
within the confines of normal work breaks and lunch periods, can deal with occasional changes
in a routine work setting but changes should be explained in advance, can tolerate occasional and

---

[2] The transcript from the hearing demonstrates that this phrase was used by the ALJ when asking
the VE about the first hypothetical individual. The undersigned is unfamiliar with this phrase and
its meaning; however, I note this portion of the hearing is not at issue.

superficial interaction with supervisors, coworkers, and the general public, contact includes what is necessary for general instruction, task completion, or training, and the interaction is limited to speaking, signaling, taking instructions, asking questions, and as similar contact, is unable to be, negotiate, direct, or supervise others, with no arbitration or confrontation, and could not perform tandem tasks could not perform Rojas Figueroa's past work. (Tr. 73-74).

However, that hypothetical individual could perform the jobs of mail clerk, DOT 209.687-026, SVP 2, unskilled, light exertion, with 40,000 jobs in the national economy; housekeeper, DOT 323.687-014, SVP 2, unskilled, light, with 175,000 jobs in the national economy; and merchandise marker, DOT 209.587-034, SVP 2, unskilled, light, with 90,000 jobs in the national economy. (Tr. 74). The VE noted that he used his training and experience "to reference the occasional overhead reach and the frequent front and lateral reaching that it seems that just aren't offered in the DOT and SCO," for this hypothetical person. (Tr. 74-75).

Further, a hypothetical individual with the same limitations as the first, but was limited to sedentary exertion could perform the jobs of document preparer, DOT 249.587-018, SVP 2, unskilled, sedentary, with 17,000 jobs in the national economy; table worker, DOT 739.687-182, SVP 2, unskilled, sedentary, with 200[3] jobs in the national economy; and film touchup screener, DOT 726.684-110, SCP 2, unskilled, sedentary, with 2,900 jobs in the national economy. (Tr. 75).

If the second hypothetical individual was further limited to needing a cane for ambulation, they could not perform the jobs of the first hypothetical individual because that person "would be a one-handed person while standing and walking, which customarily is five

---

[3] The transcript from the hearing indicates that the VE testified there were 200 jobs in the national economy, however the ALJ's decision notes that there are 8,200 jobs in the national economy. (Tr. 42).

and a half, six hours a day light work." (*Id.*). However, that hypothetical person could perform the sedentary work described for the second hypothetical individual. (*Id.*).

If a hypothetical individual needed a cane in order to balance and transition from a seated to standing position after 15 minutes of sitting and needed the cane to remain standing, the VE stated that individual could not perform sedentary work. (Tr. 77). Further, if a hypothetical individual could only sit for four hours and stand or walk for less than two hours, that would be work preclusive. (*Id.*). A hypothetical individual that could only reach in front of their body with the bilateral upper extremities 10% of the workday, they would not be able to perform the light or sedentary jobs described because "sedentary and light jobs involve frequent reaching 66% of the time[.]" (*Id.*). The limitation on reaching to 10% would be work preclusive. (*Id.*).

If the first, second, or third hypothetical individual was limited to occasional handling, fingering, and feeling, with the bilateral upper extremities, that would be work preclusive at the light and sedentary level. (*Id.*).

Finally, the VE testified that a person can be off task no more than 10% of the time to maintain employment and can incur no more than one absence per month on an ongoing basis to sustain competitive employment. (Tr. 76).

## IV. The ALJ's Decision

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.

2. The claimant engaged in substantial gainful activity during the following periods: the alleged onset date through September 5, 2021 (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4.      The claimant has the following severe impairments: depression, anxiety, obesity, cervical spine stenosis, carpal tunnel syndrome, cubital tunnel syndrome, tenosynovitis of the wrist, right knee osteoarthritis, lumbar degenerative disc disease, right shoulder partial supraspinatus tear, and adjustment disorder with mixed anxiety and depressed mood (20 CFR 404.1520(c) and 416.920(c)).

5.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; can occasionally reach overhead and frequently reach in the front and laterally with the dominant right, upper extremity; can frequently push, pull, handle, and finger with the bilateral upper extremities; must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; must avoid unprotected heights; can understand, carry out, and remember simple instructions and routine, repetitive tasks; cannot perform work requiring a specific production rate, such as assembly-line work; can meet production requirements that allow a flexible and goal-oriented pace; can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two-hour increments, for eight-hour workdays, within the confines of normal work breaks and lunch periods; can deal with occasional changes in a routine work setting, but changes should be explained in advance; can tolerate occasional and superficial interactions with supervisors, coworkers, and the general public and contact still includes what is necessary for general instruction, task completion, or training, and the interaction is limited to speaking, signaling, taking instructions, asking questions, and similar contact; can never mediate, negotiate, or direct or supervise others; can never perform arbitration or negotiation; can never perform tandem tasks; and requires a cane for ambulation.

7.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.      The claimant was born on November 17, 1979 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.      The claimant has a limited education (20 CFR 404.1564 and 416.964).

10.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

12.    The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 25-43).

## V.    Law & Analysis

### A.    Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1.    whether the claimant is engaged in substantial gainful activity;

2.    if not, whether the claimant has a severe impairment or combination of impairments;

3.    if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.    if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.    if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[4]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

**B.      Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of

---

[4] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.*  Generally, these regulations are duplicates and establish the same analytical framework.  For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI.    Discussion

Rojas Figueroa raises three issues for this Court's review:

> **1.**    The ALJ erred at Steps Two and Three of the Sequential Evaluation when she failed to properly apply the criteria of Social Security Ruling 96-8p and consider all of Plaintiff's impairments and related limitations when forming the RFC.

> **2.**    The ALJ erred when she improperly assessed the opinions of the treating and examining sources and failed to support her conclusions with substantial evidence.

26

**3.** The ALJ erred at Steps Four and Five of the Sequential Evaluation when she found Plaintiff could perform work at the sedentary level of exertion and failed to include the need for a cane for balance as well as ambulation.

(ECF Doc. 8, p. 1).

Rojas Figueroa's arguments will, at times, be addressed out of order for ease of discussion.

### A. The ALJ properly considered all of Rojas Figueroa's impairments, including those found non-severe.

Rojas Figueroa argues that "the ALJ erroneously concluded that [her] migraine headaches were not a severe impairment." (ECF Doc. 8, p. 12). In response, the Commissioner argues that the ALJ "sufficiently explained why she did not consider Plaintiff's migraine headaches to be a severe impairment." (ECF Doc. 10, p. 12). According to the Commissioner, the ALJ adequately acknowledged that Rojas Figueroa suffered from migraines and sought treatment for the same in September 2022, but in November 2022 she felt as though her medication was effective. (*Id.*). In her reply brief, Rojas Figueroa confuses this issue by arguing that the ALJ "incorrectly failed to evaluate these headaches when forming her RFC" and further "failed to include any restrictions related to [her] migraine headaches." (ECF Doc. 11, p. 1, 2-3). However, failing to include a limitation in the RFC resultant from a non-severe impairment is not the same as failing to consider a non-severe impairment when formulating an RFC. The proper inquiry, as stated, is whether the ALJ properly considered all impairments, both severe and non-severe when crafting an RFC. I find that the ALJ did just that.

At Step Two, the ALJ considers the medical severity of a claimant's impairment and whether there is a severe medically determinable physical or mental impairment – or combination of impairments – that meets Agency duration requirements. 20 C.F.R. § 404.1520(a)(4)(ii). Generally, agency regulations provide that finding no limitations or only

27

mild limitations result in finding a limitation to be non-severe. *See* 20 C.F.R. § 404.1520a(d)(1). An impairment or combination of impairments is non-severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." *Id.* at § 404.1522(a). So long as the ALJ considers all of the claimant's impairments – severe and non-severe – in the remaining steps of the disability determination, any error at Step Two is harmless. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Regarding her migraines, the ALJ found this impairment to be non-severe because "[t]reatment notes showed that [her] headaches responded to treatment." Specifically, while she reported that Imitrex and Maxalt were ineffective, she reported on November 2, 2022 that "her new migraine medication was effective." (Tr. 26). Rojas Figueroa expressed to NP Smith that her new migraine medicine was effective at treating her migraines. (Tr. 1701). As noted by Rojas Figueroa, approximately a week later, she saw CNP Daimer for her migraines reporting that they occurred over six times per month and lasted 48 to 72 hours. (Tr. 1566). However, a review of the treatment notes from this particular encounter do not negate the statements made to NP Smith indicating that her medication was effectively treating her migraines. Furthermore, while Rojas Figueroa cites to evidence that she believes supports her contention that her migraines should have been considered severe, I find this alleged failure harmless because the ALJ went on to consider all of Rojas Figueroa's impairments, both severe and non-severe when determining her RFC. (Tr. 26). Accordingly, I do not recommend remand on this basis.

**B.     The ALJ did not err by failing to analyze Listing 11.02B.**

Rojas Figueroa also argues that "[p]ursuant to Ruling 19-4p, [her] continued headaches equaled the criteria of Listing 11.02B" and thus the ALJ erred by failing to analyze the listing.

(ECF Doc. 8, p. 14). In response, the Commissioner argues "given that the ALJ found Plaintiff's migraine headaches to be non-severe, there was no logical need for her to then evaluate whether those headaches established per se disability at step three." (ECF Doc. 10, p. 12). I agree with the Commissioner.

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). But the ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; see also *Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014), quoting *Sheeks*, 544 F. App'x at 641-42. "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.*, citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; see also *Forrest v. Comm'r of Soc. Sec.*, 591 F.

App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

SSR 19-4p provides guidance on how "primary headache disorders" such as migraines, tension-type headaches, trigeminal autonomic cephalagias/cluster headaches are established and evaluated. *See* SSR 19-4p, 84 Fed. Reg. 44667, 44667-71 (Aug. 26, 2019). It also offers direction regarding a Listings analysis.

> Primary headache disorder is not a listed impairment in the Listing of Impairments (listings); however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.
>
> Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.
>
> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 84 Fed. Reg. 44667, 44670-71.

Here, Rojas Figueroa argues that her migraines were *per se* disabling because they met listing 11.02B, as applied to her migraines through SSR 19-4p, and that the ALJ failed analyze it. (ECF Doc. 8, p. 12, 14). However, "[t]he Sixth Circuit has emphasized that the claimant has the

burden of showing that [their] impairments . . . meet or are equivalent to a listed impairment." *McGeever v. Commissioner of Social Security*, No. 1:18-cv-0477, 2019 WL 1428208, *7 (N.D. Ohio Mar. 29, 2019). "Where the claimant does not mention the particular Listing at the hearing before the ALJ, the Sixth Circuit has found that the ALJ is not obligated to discuss that particular Listing." *Id.*

I previously found no error in the ALJ's determination that Rojas Figueroa's migraines were a non-severe impairment, I therefore find no error in the ALJ not finding them disabling or for failing to discuss a Listing for that non-severe impairment and accordingly do not recommend remand on this basis.

### C.    The ALJ properly considered Rojas Figueroa's subjective symptoms regarding her obesity, pain, and psychological symptoms.

Contained within Rojas Figueroa's first issue are a few rogue statements regarding her subjective symptoms; specifically, regarding obesity, pain, and psychological symptoms. While unartfully argued, it appears she takes issue with the ALJ "opin[ing] that [her] statements were not entirely consistent with the evidence" and as a result "discounted the combination of [her] obesity and how it affected the rem[a]inder of her impairments." (ECF Doc. 8, pp. 14-15). The Commissioner argues that the ALJ adequately considered Rojas Figueroa's obesity; the ALJ specifically "'considered the claimant's body habitus'" in conjunction with other impairments in support of her determination. (ECF Doc.10, p. 15, quoting Tr. 35).

When assessing a claimant's subjective statements, "'the ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged.'" *Grames v. Comm'r of Soc. Sec.*, 815 Fed. App'x 820, 825 (6th Cir. 2019) quoting *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011); SSR 16-3p, 2017 WL 5180304, *3 (Oct. 25, 2017). Next, the ALJ must

consider the objective medical evidence and the claimant's reported daily activities, as well as several other factors, to evaluate the intensity, persistence, and functional limitations of the claimant's symptoms. *See Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); 20 C.F.R. § 404.1529(c)(1)-(3); SSR 16-3p, 2017 WL 5180304, *4, *7-8 (Oct. 25, 2017). The ALJ must determine whether there is objective medical evidence from an acceptable medical source showing that the claimant has a medical impairment that could reasonably be expected to produce the alleged pain. If there is, the ALJ considers all the evidence to determine the extent to which the pain affects the claimant's ability to work. *Heart v. Comm'r of Soc. Sec.,* No. 22-3282, 2022 WL 19334605, *3 (6th Cir. Dec. 8, 2022), citing 20 C.F.R. § 416.929 (a)-(c). The review in this case must be deferential. A reviewing court "must affirm the ALJ's decision as long as it is supported by substantial evidence and is in accordance with applicable law." *Showalter v. Kijakazi,* No. 22-5718, 2023 WL 2523304, *2 (6th Cir., Mar. 15, 2023). Rojas Figueroa's argument does not overcome this deferential standard of review.

In her decision, the ALJ found Rojas Figueroa's statements regarding intensity, persistence, and limiting effects of her symptoms not entirely consistent with the medical evidence. (Tr. 32). Regarding pain, fatigue, and lack of concentration, the ALJ noted that Rojas Figueroa was consistently marked as "alert" throughout the medical record. (Tr. 32). Further, while she reported pain in her right shoulder, following her right shoulder arthroscopy and biceps tenotomy, her medical records indicated slow but steady progress. (Tr. 33). Following an MRI due to continued reports of pain, she was recommended conservative treatment. (*Id.*). The ALJ also noted that Rojas Figueroa complained of knee pain both before and after an arthroscopy and debridement of the right knee. (Tr. 33-34). However, notes also indicated that she gained relief from the procedure, and also from medication, and injections. (*Id.*).

Regarding obesity, the ALJ noted an inconsistency between Rojas Figueroa's "problems with sitting, standing, and walking" and at least five medical records from April 2021 through February 2023 noting her "normal gait." (Tr. 32). Notwithstanding this inconsistency, the ALJ stated "[b]ecause of the claimant's body habitus and some notes showing antalgic gait, the [ALJ] found sedentary work more appropriate." (Tr. 32-33).

Turning to mental health, the ALJ noted that Rojas Figueroa underwent few changes during her treatment. (Tr. 35). However, despite reports regarding her depressed mood, constricted affect, and poor appearance, she was also noted to be alert, made good eye contact, was cooperative and had appropriate demeanor. (Tr. 35-36). Further, she was continued on her mental health prescriptions. (*Id.*).

The ALJ considered Rojas Figueroa's statements regarding her pain, obesity, and mental health symptoms. In doing so, the ALJ found those statements not entirely consistent with the record and cited to evidence that both supported and negated Rojas Figueroa's statements. The analysis provided by the ALJ created a logical and accurate bridge from the evidence to the RFC, allowing the plaintiff and reviewing court to understand her reasoning. Accordingly, I decline to recommend remand on this basis.

### D.    The RFC is supported by substantial evidence.

Rojas Figueroa argues that the ALJ's decision is not supported by substantial evidence because the RFC failed "to include the need for a cane for both standing and walking" as it "was needed for balance, weakness, and pain." (ECF Doc. 8, p. 17, 24). In response, the Commissioner argues that the ALJ "did not ignore or overlook Plaintiff's alleged need for a cane for balancing" rather she discussed the medical evidence and hearing testimony and "simply

33

weighed the evidence in a manner in which Plaintiff disagrees." (ECF Doc. 10, 20-21). I agree with the Commissioner.

Before proceeding to Step Four of the sequential analysis, the ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p. "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 61 Fed. Reg. 34474, 34475 (1996). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p.

SSR 96-9p states:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

"[T]he Sixth Circuit has held that if a cane is not a necessary device for the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work." *Murphy v. Astrue*, No. 2:11-cv-00114, 2013 WL 829316, *10 (M.D. Tenn. March 6, 2013), citing *Carreon v. Massanari,* 51 Fed. App'x 571, 575 (6th Cir. 2002); *Cruz-Ridolfi v. Comm'r of Soc. Sec.,* No. 1:17 CV 1075, 2018 WL 1136119, *15 (N.D. Ohio Feb. 12, 2018), *report and recommendation adopted*, 2018 WL 1083252. To be considered a restriction or limitation, a cane "must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the cane is medically necessary," i.e., the record must reflect "more than just a subjective

desire on the part of the plaintiff as to the use of a cane." *Murphy*, 2013 WL 829316, at *10 (internal citations omitted). "If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE." *Id*. Generally, an ALJ's finding that a cane or other assistive device is not medically necessary is error when the claimant has been prescribed an assistive device and the ALJ did not include the use of the device in the RFC assessment and did not provide an explanation for the omission. *Cruz-Ridolfi,* 2018 WL 1136119, at *10, quoting *Watkins v. Comm'r of Soc. Sec.,* No. 1:16-cv-2643, 2017 WL 6419350, at *11 (N.D. Ohio Nov. 22, 2017), *report and recommendation adopted*, 2017 WL 6389607.

I note that the ALJ did include the use of the cane in the RFC but did so for ambulation only. In doing so, the ALJ discussed SSR 96-9p's requirement that medical documentation both establishes the need for an assistive device and describes the circumstances for its need. (Tr. 35). She noted that treatment notes from September 21, 2022, showed that Rojas Figueroa had a prescription for a cane for "as needed use due to high risk for falls from arthritis and musculoskeletal decondition." (*Id.*). Additionally, the ALJ found that physical therapy notes indicated use of both a straight cane and a quad cane when her feet swell. (*Id.*). The ALJ noted however, that treatment notes indicated that Rojas Figueroa had "normal gait without noted assistive device use" and "could stand without upper body assistance." (Tr. 33, 35). Furthermore, a review of the medical records demonstrates that Rojas Figueroa was prescribed a cane upon request, not as a result of objective medical examination demonstrating need. (*See* Tr. 970). Based on these medical records, the ALJ determined that the record did not support a finding that Rojas Figueroa needed a cane for balance, and instead needed it for ambulation only. (Tr. 35).

In support of her position that the ALJ erred, Rojas Figueroa cites to medical evidence in the record that she feels demonstrate her need for a cane for ambulation and balance. However, "a reviewing court can reverse the findings of an ALJ only if they are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). It is not for this Court to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Id.* Accordingly, I find no error in the ALJ's RFC determination.

### E. The ALJ did not improperly assess the opinions of Rojas Figueroa's treating source physicians.

Next, Rojas Figueroa argues that the ALJ improperly assessed the opinions of her treating and examining physicians. (ECF Doc. 8, pp. 18-23). Specifically, she argues that ALJ failed to support her determination regarding the persuasiveness of CNP Ebbitt's opinion when "she focused only on the fact that Plaintiff was alert" and on a single "note prior to the relevant period of disability where Plaintiff had a normal range of motion." (*Id.* at p. 20). She also argues that the ALJ erroneously found unpersuasive a Mental Impairment Questionnaire by LISW Stark which stated that Rojas Figueroa "would be unable to meet competitive standards with maintaining attention and concentration, managing regular attendance competing a normal workday and workweek, and performing at a consistent pace." (*Id.* at pp. 20-21). According to

Rojas Figueroa, the Mental Impairment Questionnaire was supported by the psychological consultative exam. (*Id.* at p. 21).

In contrast, the Commissioner argues that the ALJ complied with the governing regulations and referenced both supportability and consistency when discussing the opinions of CNP Ebbitt and LISW Stark. (ECF Doc. 10, pp. 16-19).

The evaluation of medical opinion evidence is governed by 20 C.F.R. § 404.1520c. This regulation mandates that the ALJ "will not defer or give any evidentiary weight, including controlling weight to any medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(a). Rather, the ALJ must evaluate each medical opinion's persuasiveness based on its: (1) supportability; (2) consistency; (3) relationship with the plaintiff; (4) specialization; and, (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c); *see also Heather B. v. Comm'r of Soc. Sec.,* No. 3:20-cv-442,2022 WL 3445856 (S.D. Ohio Aug. 17, 2022). Supportability and consistency are the most important factors; ALJs must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative findings in [their] determination or decision." 20 C.F.R. § 404.1520c(b)(2). ALJs "may, but are not required to," consider factors three through five when evaluating medical source opinions. (*Id.*).

For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). For consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources

and non-medical sources in the claim, the more persuasive the medical opinion(s) . . . . 20 C.F.R. § 404.1520c(c)(2).

An ALJ must "provide a coherent explanation of his [or her] reasoning. *Lester v. Saul*, No. 5:20-cv-01364, 20 WL 8093313 at *14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom., Lester v. Comm'r of Soc. Sec.,* No. 5:20-cv-01364. 2021 WL 119287 (N.D Ohio, Jan. 13, 2021). The ALJ's medical source opinion evaluation must contain a "minimum level of articulation" to "provide sufficient rationale for a reviewing adjudicator or court." *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 2017 WL 168819, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017). If an ALJ does not "meet these minimum levels of articulation," it "frustrates this [C]ourt's ability to determine whether her disability determination was supported by substantial evidence." *Heather B.,* at *3, *citing Warren I. v. Comm'r of Soc. Sec.,* No. 5:20-cv-495, 2021 WL 860506, at *8 (N.D.N.Y., Mar. 8, 2021).

Even when an ALJ finds a medical source's opinion persuasive or consistent and well-supported, "there is no requirement that an ALJ adopt [a medical source's] limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC. *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject. Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations.").

Here, Rojas Figueroa challenges the ALJ's assessment of two treating sources. First, she challenges the ALJ's finding that CNP Ebbitt's May 27, 2022 Medical Source Statement was

unpersuasive. (ECF Doc. 8, p. 20). She argues that this finding of persuasiveness was erroneous because the ALJ "failed to support her determination as she focused solely on the fact that [Rojas Figueroa] was alert and one note prior to the relevant period of disability where Plaintiff had a normal range of motion" (*Id.*). As it relates to the ALJ's focus regarding Rojas Figueroa being alert, the ALJ stated that the finding that Rojas Figueroa would be off task 25% of the time or more was inconsistent with the medical record, citing to various records from June 2021 through February 2023 where her providers noted she was alert. (Tr. 37). Rojas Figueroa does not point to any medical record evidence that the ALJ failed to consider in making this finding and rather asks this Court to reconsider the ALJ's decision, something the Court cannot do. Accordingly, I find this argument to be without merit.

Regarding the ALJ's finding about her range of motion, Rojas Figueroa argues that this conclusion was inconsistent with her finding that Rojas Figueroa had been prescribed a cane for a high risk of falls. (ECF Doc. 8, p. 20). As previously discussed, I find no error in the ALJ's findings related to Rojas Figueroa's need for a cane. In that analysis, it was noted that the ALJ acknowledged that Rojas Figueroa was diagnosed a cane on an as-needed basis due to her risk of falls. As stated previously, I decline the invitation to re-weigh the evidence.

Turning to LISW Stark's Mental Health Impairment Questionnaire, Rojas Figueroa argues that the ALJ's determination that this opinion was unpersuasive was not supported because she focused on the fact that Rojas Figueroa was alert and could drive. (ECF Doc. 8, p. 21). I disagree with this categorization of the ALJ's decision. In finding that the Mental Health Questionnaire was unpersuasive, the ALJ stated that the opinion expressed within it did not contain citation to evidence in support of it and was not consistent with the medical record. (Tr. 38). In addition to citing LISW Stark's own treatment records finding that Rojas Figueroa was

consistently alert at medical appointments and the fact that Rojas Figueroa was able to drive, the ALJ further noted that Rojas Figueroa testified that she did chores to the best of her ability, that she could perform serial threes at her consultative exam, and that the record provided no indication that she was incapable of attending medical appointments "including consistently keeping appointments with [LISW] Stark." (*Id.*). Rojas Figueroa cites to the psychological consultative examination performed by Dr. Faust in support for her position, however, it is not for this Court to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

Because I find that Rojas Figueroa has not demonstrated any reversible error, I do not recommend remand based the ALJ's opinions of her treating source physicians.

## II.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Rojas Figueroa's applications for DIB and SSI be affirmed.

Dated: November 22, 2024

Reuben J. Sheperd
United States Magistrate Judge

---

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of

40

the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).